**ELI LILLY AND COMPANY, Inc., an Indiana corporation, et al., Plaintiffs,**

v.

**GENERIX DRUG SALES, INC., a Florida corporation, et al., Defendants.**

No. 69–1241–Civ.

United States District Court, S. D. Florida.

March 5, 1971.

Smathers & Thompson, Ralph & Boyd, Miami, Fla., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, David L. Ladd, Chicago, Ill., of counsel, for plaintiffs.

George Wright, Miami, Fla., Robert W. Smiley, Pittsburgh, Pa., John H. Lewis, Miami, Fla., Richard Leben, Hollywood, Fla., Lilling & Siegel, New York City, M. A. Baskin, Miami, Fla., Richard F. Bergner, Houston, Tex., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

KING, District Judge.

This cause having come on for hearing upon the motion of Plaintiffs, Eli Lilly and Company, Inc. and Eli Lilly and Company, for a preliminary injunction, enjoining and restraining, pendente lite, the Defendants, Caribe Chemical

Company, Inc., Ellencee Pharmaceutical Laboratories, Inc., Houston Biochemical Industries, Inc., and Paolo C. Carlotti from infringing U. S. Patent No. 2,728,779, and the said Defendants having filed a cross-motion seeking an order, pendente lite, from engaging in specified courses of conduct, and the Court having received evidence, including extended testimony of numerous witnesses, taken briefs of the parties, and heard arguments of counsel,

WHEREUPON, the Court makes and enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The Plaintiffs, Eli Lilly and Company, Inc. (hereinafter referred to as "Lilly Puerto Rico") and Eli Lilly and Company (hereinafter referred to as "Lilly") are corporations organized and existing under the laws of the State of Indiana, the former being a wholly owned subsidiary of the latter.

2. The Defendant, Ellencee Pharmaceutical Laboratories, Inc., (hereinafter referred to as "Ellencee") is a corporation organized and existing under the laws of the State of New York.

3. The Defendant, Caribe Chemical Company, Inc. (hereinafter referred to as "Caribe") is a corporation organized and existing under the laws of the territory of the Virgin Islands.

4. The Defendant, Houston Biochemical Industries, Inc. (hereinafter referred to as "H. B. C.") is a corporation organized and existing under the laws of the State of Delaware.

5. The Defendant, Paolo C. Carlotti, is a citizen of Italy and resides in Houston, Texas.

6. The Plaintiffs have been and are marketing alpha-dextro propoxyphene hydrochloride under the trademark DARVON®, and the Defendants intend to market alpha-dextro propoxyphene hydrochloride, the products being chemically identical and being the alpha dextro form of 1,2-diphenyl-2-propionoxy-3-methyl-4-dimethylaminobutane hydrochloride.

7. On December 3, 1952, United States Patent Application Serial No. 323,947 was filed in the United States Patent Office in the name of Albert Pohland as inventor, and on December 27, 1955, United States Letters Patent No. 2,728,779 was issued thereon by the United States Patent Office to Lilly. Lilly assigned United States Letters Patent No. 2,728,779 to Lilly Puerto Rico by an instrument executed December 5, 1966 and recorded in the United States Patent Office on February 14, 1969, at Reel 2462, Frame 566. At all times material hereto all right, title, and interest in and to said Letters Patent have been in Lilly Puerto Rico.

8. United States Patent No. 2,-728,779 relates to a chemical compound, 1,2-diphenyl-2-propionoxy-3-methyl-4-dimethylaminobutane hydrochloride ("propoxyphene hydrochloride" herein) which is useful as a centrally acting analgesic of the morphine class, but which does not have the undesirable toxic side effects commonly associated with analgesics of that class, such as a respiratory depression, which is recognized as an indicator of addiction liability.

9. According to the patent, propoxyphene hydrochloride possesses two centers of asymmetry and, therefore, occurs in two pairs of mirror-image forms. The less-soluble pair is called the "alpha" pair; the more-soluble, the "beta" pair. The individual members, or optical isomers, of each pair are called "dextro" and "levo", respectively. Thus, propoxyphene hydrochloride appears in the forms of the individual alpha-d, alpha-l, beta-d, and beta-l isomers and in mixtures of those isomers, including racemic mixtures (called "alpha-dl" and "beta-dl") having equal parts of the d and l isomers.

10. Plaintiffs have notified the defendants of their election to rely solely upon Claim 2 of the patent. Claim 2 of the patent commences with the expression "α-dl," by which is meant a race-

mic mixture of equal quantities of the less soluble dextro ("d") and levo ("l") isomers, and, as the parties have stipulated, "the d and l optical isomers are both present in the racemic mixture." Propoxyphene hydrochloride is literally presented and discussed in the patent only in its racemic mixture (or "dl") form; the individual optical isomers are not expressly and separately presented or discussed apart from their inherent inclusion in the racemic mixture.

11. The specification of the patent states that "the à-dl diastereoisomers are the preferred compounds of the invention since they possess marked analgesic activity in contrast to the β-dl diastereoisomers, which are substantially inactive." The patent thus states the utility of the compounds to be as analgesics, and the beta (i. e., more-soluble) forms are identified in the patent specification as inactive for this purpose. Thus, the inventor expressed his intent to disclose and claim the analgesic forms of the optically active compounds, including propoxyphene hydrochloride. Claim 2 of the patent is literally drawn, in normal chemical nomenclature, to the alpha-dl form, but interpreted in light of the specification and the inventor's intention, covers the analgesically active forms, both of which are alpha forms—namely, the alpha-dl and the alpha-d. Claim 2 by its literal language excludes the analgesically inactive beta forms—that is, the beta-l, beta-d, and their beta-dl mixture—and interpreted in light of the specification and the inventor's intention, excludes the analgesically inactive alpha-l form as well.

12. The parties have stipulated that it "is common knowledge that optical isomers of a chemical compound frequently differ in their pharmacological action. Specifically, it is known that analgesic compounds related in structure to methadone [like propoxyphene] occur in optically active forms and that the analgesic activity of such compounds is exclusively or predominantly with one of the isomers, as with methadone itself"; and it is undisputed that this was known prior

to the date of Pohland's invention of propoxyphene. Thus, Pohland in his patent specification ruled out the β forms (beta-l, beta-d, and their mixture beta-dl), and pointed to the analgesic activity as residing in the alpha racemic mixture. In due course, after his patent application was filed, Pohland and his assistant Sullivan, using conventional procedures, resolved the analgesically active alpha-dl racemic mixture into its component isomers, and ascertained the analgesic property to reside in the alpha-d isomer alone. Thus, Pohland explicitly and expressly disclosed in his patent application the alpha-dl form as the best—and only—form of propoxyphene which he had synthesized and tested at the time the application was filed; and in light of the state of the art as acknowledged by the stipulation, Pohland in his patent specification also implicitly and inherently made available the active alpha-d isomer.

13. The Pohland analgesic propoxyphene hydrochloride satisfied a long-felt need for a synthetic analgesic having the pain-relieving properties of morphine but without addiction liability. That search began in the late 1920's and was accelerated in later years by two events. The first of those events was the scarcity of morphine during the second World War. The first fully synthetic analgesic drug to result from this search was a drug known as meperidine, which appeared in the early 1940's. This drug was a landmark development in that it was the first fully synthetic analgesic. Like morphine, however, meperidine proved to be addictive. The second of these two events came at the close of World War II: American scientific intelligence teams investigated German wartime work on synthetic analgesics and published a report (the "Kleiderer Report") summarizing that work for the American scientific community. The Kleiderer Report dealt with a number of synthetic substances, among which was one which subsequently became known as methadone. Methadone proved to be as active an analgesic as

morphine, but also proved to be equally high in addiction liability.

14. The publication of the Kleiderer Report caused an intensive research effort to be mounted in the United States and abroad for a nonnarcotic synthetic analgesic of the morphine class. Several major pharmaceutical companies, including Lilly, Ciba, Squibb, Hoffmann-La-Roche, Smith, Kline & French, and Winthrop participated in this effort. To coordinate and foster this research, the Committee on Drug Addiction and Narcotics (later renamed the Committee on Problems of Drug Dependence), a committee of experts formed and sponsored by the National Academy of Science, assumed responsibility for monitoring this work, selecting promising compounds for clinical tests in humans, reviewing publications and research results flowing from this work, and sponsoring annual meetings for exchange of research data among scientists working in the drug companies, universities, and other laboratories, and the U. S. Commissioner on Narcotics.

By 1950, hundreds of compounds evidencing analgesic potency were being submitted for study in human beings for addiction liability—so many that facilities for clinical testing on prisoner volunteers at the Federal Addiction Research Center at Lexington, Kentucky were "swamped". As a result, under a grant from the Committee, a new research facility for screening various compounds for addiction liability was established at the University of Michigan under the direction of Dr. Maurice H. Seevers. Only those compounds which had already showed analgesic potency were accepted for testing at the University of Michigan; and only those which proved "interesting" in tests at the University of Michigan—that is, having in addition to analgesic potency, favorable pharmacological characteristics such as long duration of analgesia, fewer adverse reactions, less rapid development of tolerance, and lower addiction liability—were submitted to Lexington for further testing in humans. To expedite the work of all investigators and companies without prejudicing their respective patent or proprietary rights, the Committee devised a system for anonymously coding compounds submitted, with test results to be released only after the submitting laboratories or companies had been allowed time to file patent applications.

Lilly submitted Pohland's propoxyphene for testing at the University of Michigan and later at Lexington. The compound proved to be the first synthetic analgesic of the morphine class (i. e., centrally acting) having negligible hazard of addiction. Lilly introduced Darvon commercially in 1957, and since then Darvon has remained unique as the only such analgesic commercially available.

15. That Pohland's compound, propoxyphene hydrochloride, satisfied a long-felt need for such a product is shown by the dramatic commercial success it has achieved. After it was commercially introduced in 1957, sales increased substantially each year to a current annual rate of sales being in the order of $65,000,000. Since the introduction of the product on the market, total wholesale sales have aggregated in excess of $450,000,000.

16. The drug industry is highly competitive, but despite the extraordinary commercial success of propoxyphene hydrochloride, the industry, with two exceptions, has acquiesced in and respected both the validity of the Pohland patent and its coverage of the alpha-d form of Pohland's compound by refraining from the manufacture and sale of propoxyphene in any form, including the alpha-d form. At least two members of the industry, The Upjohn Company and Richlyn Laboratories, demonstrated their acquiescence in the validity and scope of the plaintiffs' patent by requests for licenses for the alpha-d form.

17. Not until eleven years after the patent issued did the first of the two aforesaid attempts to challenge Plaintiffs' patent occur. In 1966, Plaintiff Lilly brought an infringement suit

against Generic Formulae, Inc. That action resulted in the prompt entry of a consent decree in which Generic Formulae acknowledged validity of Plaintiffs' patent and its infringement by the sale of the alpha-d form of propoxyphene hydrochloride. The second attempt was made in 1968 by Milan Pharmaceuticals, Inc. and also resulted in the commencement of an infringement action by Plaintiff Lilly Puerto Rico. In that action, Plaintiff Lilly Puerto Rico sought and obtained a temporary restraining order over strong opposition by Milan Pharmaceuticals, Inc. Subsequently. Milan Pharmaceuticals consented to the entry of a judgment in which it acknowledged that Plaintiffs' patent was valid and had been infringed by the manufacture and sale of the alpha-d form of propoxyphene hydrochloride.

18. Plaintiffs have never marketed the racemic mixture, alpha-dl propoxyphene hydrochloride. They have at all times marketed the alpha-d form of propoxyphene hydrochloride, a prescription drug, under the trademark "DARVON". Plaintiffs' principal product, Darvon Compound 65 (frequently prescribed as "DC-65") is marketed in red and gray, bullet-shape, size O capsules, which contain, in addition to propoxyphene hydrochloride, a mixture of aspirin, phenacetin and caffeine. Until last spring, but not subsequently, Plaintiffs' propoxyphene hydrochloride was contained in the capsule in the form of a coated pellet.

19. The Defendants propose to market the alpha-d form of propoxyphene hydrochloride under the name PC 65. They propose to market the product in pellet form in capsules of substantially the same size and color combination as Plaintiffs'.

20. The inter-relationships of Defendants and their plans and intentions with respect to the manufacture and marketing of propoxyphene hydrochloride are as follows:

A. H. B. C. was first organized in 1965 under the name S. I. R.-U. S. A. Thereafter, its corporate name was changed several times, and it is now known as Houston Biochemical Industries, Inc. Prior to 1968, its only business was ownership of certain securities of an Italian company originally known as Specialita Integrativi Razionali, S. p. A. (S. I. R.) and now known as Cortex.

B. The Defendant Caribe, a wholly owned subsidiary of Defendant H. B. C., was organized for the purpose of carrying on manufacturing and processing operations in the Virgin Islands. Those operations fall into two separate categories, one dealing with chemical products will be sold to H. B. C. for distribution and marketing and its pharmaceutical products will be sold to Ellencee for distribution and marketing. It is intended that Caribe will import bulk propoxyphene hydrochloride from Cortex in Italy and will pelletize, encapsulate, bottle and package the propoxyphene hydrochloride in the Virgin Islands.

C. Defendant Ellencee is a wholly owned subsidiary of Caribe and was organized for the purpose of distributing and marketing pharmaceutical products manufactured by Caribe. Ellencee proposes to market propoxyphene hydrochloride through mail order houses in the United States.

D. Defendant Carlotti is Chief Executive Officer of Defendants Ellencee, Caribe and H. B. C. and, in fact, organized H. B. C. He was originally affiliated with H. B. C.'s Italian subsidiary S. I. R., now known as Cortex, having been an officer and director of that company holding a 30% stock interest which he later transferred to H. B. C. He also has a substantial stock ownership in H. B. C.

21. Defendants contend that the most relevant prior art reference is the Chen paper. Although defendants initially argued, in their prehearing memorandum and opening statement, that Pohland's invention of propoxyphene hydrochloride was "anticipated" (35 U.S.C. § 102) and disclosed by Chen, no proof was offered that propoxyphene was identically disclosed in the prior art; and in

closing argument defendants argued the prior art only on the grounds of "obviousness" (35 U.S.C. § 103) and conceded that a precedent based on the defense of anticipation differed from the case at bar in that respect.

22. The Chen reference did not make Pohland's invention of propoxyphene obvious. On the contrary, the disclosures of the Chen paper would lead an investigator away from propoxyphene hydrochloride rather than toward it. Chen emphasizes the criticality of placing a methyl group adjacent to the N-atom (i. e., in the alpha position, as in methadone), rather than in the beta position (as in propoxyphene hydrochloride). To the extent that Chen suggests positioning the methyl group beta to the nitrogen atom to be of "more than casual interest," that suggestion was made in connection with a group of compounds far removed from propoxyphene hydrochloride, and the evidence shows that as the methyl group was so positioned in that series of compounds, the analgesic potency was not enhanced and in most instances was reduced. None of the reverse esters in Chen appeared to be promising, and the specific reverse ester that Chen characterized as "the best member of the series" (referred to during the hearing and hereinafter as the "Chen Compounds") was reported to have analgesic activity at only 3% that of methadone, and was subsequently shown to have no significant analgesic activity at all. Other than analgesia, Chen makes no disclosure which would allow any understanding of pharmacological properties of the compounds disclosed, such as respiratory depression, addiction liability, toxicity and the like.

23. During the Patent Office prosecution of the Pohland patent, both the Roche patent and the Kjaer publication were considered, and propoxyphene hydrochloride was found to be patentably distinct therefrom. Pohland's invention of propoxyphene hydrochloride was not identically disclosed (35 U.S.C. § 102), nor made obvious (35 U.S.C. § 103) by Chen, Roche, Kjaer, or the prior art as a whole. The Chen paper was delivered to a scientific conference in May 1948 and published in November of that year. Of the thirty-three compounds disclosed in the tables of the Chen paper, over twenty were personally synthesized by Dr. Pohland and the others by Dr. Pohland's colleagues at Lilly. Although defendants stress that there are only two differences in substituents or functional groups between the Chen Compound and propoxyphene, more than three years passed after Dr. Chen delivered his paper in 1948 until Dr. Pohland synthesized propoxyphene in late 1951, in the context of an urgent and competitive research effort. Moreover, the evidence reveals that scientists in the field were pessimistic about discovering a non-narcotic morphine-like analgesic; that a respectable body of scientific opinion held that any potent analgesic would prove addictive; that Dr. Nathan Eddy, "undoubtedly the world's leading authority in drug addiction of this type," held that view; that minor changes in the substituents of a compound can profoundly affect its analgesic potency; and that reliable prediction of either analgesic potency or addiction liability on the basis of structure cannot be made. Although in hindsight, structure-to-function generalizations can sometimes be made in chemistry, such relationships cannot be predicted in the field of analgesic compounds but can be ascertained only retrospectively after experimentation and testing.

Apart from structural similarities and differences between propoxyphene hydrochloride and prior art compounds, nothing in any of the prior art references relied upon by defendants gives any information or understanding, or permits any appraisal, of the compounds therein disclosed with respect to their addiction liability. When propoxyphene was tested at the University of Michigan, the unique combination in that compound of analgesic potency with low addiction liability was so surprising that Dr. Eddy, then Executive Secretary of the Committee, believed the initial test

results on propoxyphene were a "fluke", and resubmitted propoxyphene several times under different code numbers for more rigorous additional tests. The United Nations' World Health Organization for a time classified propoxyphene as a Class II (codeine-like) narcotic, and the United States Government initially proposed to classify propoxyphene as a narcotic, but did not do so after a hearing and evidence presented by Lilly.

Therefore, comparing Pohland's propoxyphene against the prior art, including Chen, either in terms of (1) chemical structure, or (2) pharmacological properties of (a) analgesic potency and (b) low addiction liability, Pohland's propoxyphene cannot be considered to have been identically disclosed, suggested, or made obvious by the prior art; and expert opinion testimony to the effect that Pohland's invention of propoxyphene was obvious, given in hindsight nineteen years after the event, must yield to the historical and objective evidence that propoxyphene was not structurally obvious, but a significant scientific achievement (moving against Chen's teachings, for example, of the criticality of the methyl group in the alpha position of the amine chain, and of the disappointing result attending substitution of a benzyl for a phenyl) ; the Lilly compounds in the Chen article, mostly submitted by Pohland himself, were available to Pohland and other scientists for over three years before he synthesized propoxyphene; the low-addiction characteristics of the compound surprised Dr. Eddy and others; Pohland made the invention after many failures by himself, his colleagues at Lilly, and other scientists elsewhere in an urgent and widespread research effort; DARVON's medical and commercial acceptance was immediate and dramatic; propoxyphene has continued to stand as unique over years of continuing research for a drug of comparable characteristics; and the drug industry has paid tribute to the stature of the invention by voluntary forbearance from infringement of Pohland's patent.

24. The Chen Compound was first synthesized at Lilly by Dr. Whitehead and tested for analgesia in 1947. On that test, the Whitehead preparation was reported to have "$\frac{1}{30}$th the analgesic potency of 'Dolophine' (Methadon, Lilly)." Chen's paper, published in 1948, reported a compound of this structure to be "$\frac{1}{33}$ as active as methadone."

Three years later in September 1951, Dr. Pohland submitted for retesting a number of compounds previously tested at Lilly, including Dr. Whitehead's preparation of the Chen Compound. The report on the retest dated November 1951 indicated the Chen Compound to have an analgesic potency of $\frac{1}{5}$ that of methadone, or six times the potency indicated by the 1947 test of the same substance.

Dr. Pohland then synthesized a series of analogues of the Chen Compound, including propoxyphene. Propoxyphene was tested in January 1952, showing a high order of analgesia without toxic side effects. In April 1952, Dr. Pohland suggested that Lilly's patent counsel consider filing a patent application on propoxyphene (Compound 16298) and its analogues. In May 1952 Dr. Pohland's assistant Sullivan meticulously resynthesized the compound of the structure theretofore given for the Chen Compound; and in June 1952 Dr. Pohland wrote Lilly's patent counsel a memorandum on "Analgesic 16298 [i. e., propoxyphene] and Analogues" in which he referred to the Chen Compound as the "parent compound of this series of reverse esters"—meaning that the Chen Compound was chronologically the first reverse ester structurally related to methadone reported in the literature. That memorandum also discussed Kjaer's reverse ester and another prior art reverse ester of Burckhalter. In that memorandum, Dr. Pohland observed that Chen's paper reported the Chen Compound to be $\frac{1}{30}$th as potent as methadone, but that "[l]ater tests have shown analgesic activity of lower degree at smaller doses (Table)." The data given on the Chen Compound (Lilly No. 04351) are those for the Sullivan prepa-

ration of the compound of 1952, not the Whitehead preparation of 1947; and the "Analgesic Action" reported for the compound showed it to be substantially inactive as an analgesic and unacceptable because of the appearance of toxic signs—i. e., the depressor effect—beginning at doses just above the level giving a trace of analgesic activity. In 1953, Dr. Pohland published a scientific paper reporting on several esters as "worthy of further study," including propoxyphene. Data for the Sullivan preparation of the Chen Compound is the first entry in Table II of that article, but the article does not identify it as one of the "interesting esters" or one "worthy of further study". Dr. Pohland's 1953 article cites the Kjaer and Burckhalter articles, but not the Chen article. Thus, prior to the date Dr. Pohland wrote the June 1953 memorandum to Lilly's patent attorney and prior to the filing of the application in December 1952, Dr. Pohland and Lilly had ascertained that a compound of the structure reported in the Chen paper was of no interest as an analgesic.

25. Defendants contend that Pohland's (and Lilly's) failure to cite the Chen paper to the Patent Office in itself is a ground for invalidating the patent and proves Lilly to have unclean hands. Lilly did, however, voluntarily bring to the attention of the Patent Office the Kjaer paper, and the Kjaer compounds were closer to propoxyphene hydrochloride in terms of chemical structure than the Chen Compound. In fact, the closest Kjaer compound was an adjacent homologue of propoxyphene, while the Chen compound is an analogue. When the Kjaer paper was brought to the attention of the Patent Office, it was known that the Chen Compound was inactive as an analgesic. Lilly fulfilled any obligation it had to make a full and complete disclosure in the course of its dealing with the Patent Office. In late 1951, when Pohland first synthesized propoxyphene, Pohland also synthesized the propionate ester analogue of the Chen Compound (an ace-

tate), but defendants concede that this propionate compound is not a part of the prior art, nor does the fact that the propionate showed some analgesia when tested at that time, contradict the evidence that Dr. Pohland's assistant Sullivan in 1952 meticulously resynthesized the Chen Compound acetate, and tests then showed that compound to be of no interest as an analgesic.

26. Pohland's patent specification does not expressly discuss addiction liability as such, but rather characterizes propoxyphene as an analgesia "without toxic side effects such as respiratory depression." Respiratory depression is recognized as an indicator of addiction liability; and as Dr. Seevers testified, "in all the compounds that hitherto have been tested this is a reliable index of whether a compound is likely to produce physical dependence or addiction." Lilly's package insert for DARVON, whose text has been reviewed by the Food and Drug Administration for scientific and medical accuracy and soundness, states:

"Propoxyphene hydrochloride is an analgesic. The combination of propoxyphene hydrochloride with aspirin and/or phenacetin results in greater analgesia than that achieved by either drug administered alone. Propoxyphene hydrochloride is structurally related to the narcotic analgesics methadone and isomethadone, and its general pharmacologic properties are those of the narcotics as a group.

"In most individuals, recommended doses of propoxyphene hydrochloride have not caused clinically significant alterations of respiration, blood pressure, or pulse rate."

Thus, Pohland's statement about the absence of respiratory depression in his 1952 patent application was made on the basis of his data at that time, and subsequently propoxyphene did prove clinically to have low addiction liability and no significant effect in depressing respiration.

27. Defendants' contention that Pohland was not the original or sole inven-

tor of the alpha-d form of propoxyphene hydrochloride is not established by the evidence. In support of this contention, they claim that the resolution of the racemic mixture was conducted by Hugh Sullivan and that, therefore, Sullivan is the inventor of the product marketed by Plaintiffs. At the time that Pohland arrived at the alpha-dl form of propoxyphene hydrochloride, his invention was complete, and it included the alpha-d form. It was then known, and the parties have stipulated, that "analgesic compounds related in structure to methadone occur in optically active forms and that the analgesic activity of such compounds is exclusively or predominantly with one of the isomers, as with methadone itself." Pohland and Sullivan thereafter resolved the racemic mixture of propoxyphene into its isomers, using a standard procedure, confirmed the analgesia as residing in the alpha-d isomer, and published these findings in the Journal of the American Chemical Society in 1955.

28. Defendants contend that Claim 2 would not be infringed by the manufacture or sale of the alpha-d form of propoxyphene hydrochloride, first, because the literal language of the claim does not include the alpha-d form, and, second, because any right to claim the alpha-d form was abandoned by public disclosure of the alpha-d form in the Pohland-Sullivan paper in 1955 before the patent issued in December 1955. The evidence has established that when Pohland arrived at the alpha-dl form of propoxyphene hydrochloride, his invention was complete and included the alpha-d form. Therefore, Claim 2, although drawn literally to the alpha-dl form, must be read in the light of the specification and of the state of the art to cover the *analgesic* forms of propoxyphene —i. e., the alpha-dl racemic mixture and the alpha-d isomer. Since Claim 2 is read to include the alpha-d form of propoxyphene hydrochloride, the publication of the Pohland-Sullivan paper in 1955, after the filing of the patent application, did not result in any abandonment

of any patent rights with respect to the alpha-d form.

29. Defendants further contend that Plaintiffs are barred from resorting to the doctrine of equivalents to read Claim 2 on the alpha-d form of propoxyphene hydrochloride because such an interpretation would require that the claim read also upon the alpha-l form. In that event, Defendants contend, the claim would cover a substance which is inactive as an analgesic, and the claim would, therefore, be invalid. However, the doctrine of equivalents treats as the same thing, for legal purposes, those substances (in this case the α-dl and α-d forms of propoxyphene) which perform the same function (in this case, analgesic) in substantially the same way (in this case, through the analgesic action of the α-d isomer, either alone or in the α-dl racemic mixture). In accordance with the very terms of the doctrine, only those forms of the compound performing the declared function or utility (in this case, analgesia) came within the range of equivalents. Since the α-l form does not possess analgesic properties, it cannot and does not come within the range of equivalents; and the application of the doctrine of equivalents does not and cannot, by its definition, cause the claim to read on the analgesically inactive α-l isomer. The Court finds that Claim 2 literally covers the α-dl form; that interpreted in light of the specification, that claim also covers the α-d form; that in any case the claim covers the α-d form by the doctrine of equivalents; that the doctrine of equivalents cannot and does not cause the claim to read upon the α-l analgesically inactive form; that plaintiffs are not barred for any reason from the application of the doctrine of equivalents; and that claim 2, relating as it does to a landmark and pioneer invention, is entitled to the widest possible range of equivalents to cover the analgesic forms.

30. The evidence has established, and this Court so finds, that manufacture, use or sale of the alpha-d form of propoxyphene hydrochloride by Defendants

or any of them within the United States, its territories or possession, would constitute an infringement of Claim 2 of the United States Patent No. 2,728,779.

31. The evidence establishes that the Plaintiffs will suffer irreparable harm and injury if a preliminary injunction is not granted, in that:

A. Plaintiff's propoxyphene hydrochloride product has been used by the public for a number of years with the result that physicians, nurses, pharmacists and patients have become intimately familiar with its appearance and efficacy.

B. Plaintiffs are the sole source of propoxyphene hydrochloride in the United States.

C. If Defendants were to market their product, which in appearance is similar to but different from that marketed by Plaintiff, substantial confusion in the market would result.

D. The evidence establishes that Defendants' entry into the market would not expand the overall size of the market for propoxyphene hydrochloride and, therefore, any sales made by the Defendants would be sales lost the Plaintiffs. This Court's Order of April 2, 1970, embodied Defendants' stipulation that they intend to manufacture and sell 3,000,000 to 4,000,000 capsules of propoxyphene hydrochloride per month.

32. Plaintiffs have expended substantial amounts of money, time and effort in the development and marketing of their product. Research activities leading to the discovery of the product were carried on over a period of almost ten years.

33. Defendants, on the other hand, have expended almost nothing on research and development for their product. Their primary expenditure has been for purposes of conducting tests, the result of which were submitted to the Federal Food and Drug Administration in connection with their New Drug Application.

34. At all times during the course of their activities looking toward the marketing of propoxyphene hydrochloride, Defendants acted with full knowledge of Plaintiffs' patent position and vigorous enforcement of their patent rights. During the initial stages of the Defendants' activities, Defendant Carlotti sought and obtained the aid of Defendant Panoz at a time when Panoz was president of Milan Pharmaceuticals, an enjoined infringer. This aid included an appraisal of the legal issues involved with respect to Plaintiffs' patent, the names of potential customers, the types of equipment needed, as well as the sources of that equipment, and the purchase and sale of capsules suitable for propoxyphene hydrochloride.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this cause and over these Defendants. Venue is proper as to these Defendants.

■ 2. Claim 2 of the United States Patent No. 2,728,779 is valid.

■ 3. The α-d form is included within the scope of Claim 2 and is also within the range of equivalents to which the invention of Claim 2 is entitled. The manufacture, use, or sale of the alpha-d form of propoxyphene hydrochloride in the United States, its territories or possessions by these Defendants, or any of them would constitute an infringement of Claim 2 of United States Patent No. 2,728,779.

4. Plaintiffs are entitled to a preliminary injunction until final determination of this action or further order of this Court restraining these Defendants, and each of them, their subsidiaries, officers, agents, servants, employees and attorneys, and those in active concert of participation with them, or any of them, who shall be personal service or otherwise have received actual notice of the same, from directly or indirectly infringing upon Claim 2 of United States Letters Patent No. 2,728,779 by the manufacture, use or sale in the United States, its territories or possessions of

the alpha-d form of propoxyphene hydrochloride.

5. These Defendants are not entitled to the preliminary injunction sought by their motion of December 7, 1970.

## ORDER

Based upon the foregoing findings of fact and conclusions of law, it is,

Considered, ordered and adjudged as follows:

1. The Plaintiffs' motion for a preliminary injunction be and the same is hereby granted. The Defendants, Caribe Chemical Company, Inc., Ellencee Pharmaceutical Laboratories, Inc., Houston Biochemical Industries, Inc., and Paolo C. Carlotti and each of them, their subsidiaries, officers, agents, servants, employees and attorneys, and those in active concert of participation with them, or any of them, be and they are temporarily enjoined, until further order of this Court, from directly or indirectly infringing upon Claim 2 of United States Letters Patent No. 2,728,779 by the manufacture, use or sale in the United States, its territories or possessions, of the alpha-d form of propoxyphene hydrochloride.

2. This injunctive order shall become effective upon posting, by the Plaintiffs Eli Lilly, Inc., and Eli Lilly and Company, of a bond or other security in the sum of $50,000.00, conditioned upon the payment of such costs and damages as may be incurred or suffered by any of the Defendants herein enjoined in the event that this injunctive order shall be subsequently dissolved by order of Court upon a finding that the Defendants were wrongfully enjoined or restrained. The Plaintiff corporation shall have seven days from the date hereof within which to post the injunctive bond as specified in this order.

3. The motion of the Defendants for a preliminary injunction be and the same is hereby denied.