**ZENITH LABORATORIES,
INC., Plaintiff,**

v.

**ELI LILLY AND COMPANY, Defendant.**

Civ. A. No. 77–1804.

United States District Court,
D. New Jersey.

July 7, 1978.

Lewis B. Cohn, Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., Alfred B. Engelberg, Amster & Rothstein, New York City, for plaintiff.

William H. Horton, McCarter & English, Newark, N. J., Edward N. Sherry, Jack Kaufman, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, D. Dennis Allegretti, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., for defendant.

MEANOR, District Judge.

This matter comes before the court on defendant's order to show cause seeking a preliminary injunction against plaintiff's alleged patent infringement and unfair competition. On August 30, 1977, plaintiff Zenith Laboratories, Inc. (hereinafter Zenith) brought suit against defendant Eli Lilly and Company (hereinafter Lilly) for a declaratory judgment of non-infringement and invalidity with regard to two of Lilly's patents covering compounds in the family of antibiotic drugs known as cephalosporins. More specifically, Zenith alleged that United States Patent No. 3,507,861 (hereinafter '861 Patent), entitled "Certain 3-Methyl-Cephalosporin Compounds," and United States Patent No. 3,655,656 (hereinafter '656 Patent), entitled "Crystalline Cephalexin Monohydrate," are invalid, and that Zenith's sale of cephalexin monohydrate in capsule form in the United States does not infringe on said patents. Lilly has counterclaimed for infringement of both patents, conspiracy to violate the U.S. patent laws with certain unnamed foreign drug manufacturers, and unfair competition predicated on federal and state statutes and various state common law theories. Jurisdiction of the action is grounded on 28 U.S.C. § 1338(a) (1976).

Lilly has applied for a preliminary injunction against Zenith's infringement of the '656 Patent by the sale of cephalexin monohydrate and against Zenith's unfair competition by the adoption of trade dress similar to that of Lilly's cephalexin monohydrate product, marketed under the trademark Kelfex. At a limited hearing held on December 12, 1977, both parties agreed that a full evidentiary hearing was unnecessary. Thus, the instant application is before me on affidavits, briefs and oral argument.[1] I find that a preliminary injunction against Zenith's infringement of the '656 Patent is justified and grant Lilly's motion to the extent that it pertains to infringement. Because this relief moots the remainder of Lilly's motion, I do not reach Lilly's unfair competition claims.

## STATEMENT OF FACTS

*Preface.*

The cephalosporins are a family of antibiotic drugs derived from material produced by the fungus *Cephalosporium acremonium.* Cephalosporin-C, the parent compound from which the drug family was developed, was first isolated by British scientists in the 1950s. As a group the cephalosporins possess a number of properties which make them unusually effective as antibiotics. Bacteria are commonly classified in accordance with whether they take or reject a so-called Gram stain, named after the scientist who discovered the classification test. Those which take stain are termed gram-

---

1. A motion for preliminary injunction may be decided on affidavits within the discretion of the court. *Norwich Pharmacal Co. v. International Brokers Inc.,* 159 U.S.P.Q. 417, 420 n. 1 (N.D.Ga.1967); 8 *Walker on Patents* § 683 (Deller 2d ed. 1973). Such action is particularly appropriate where the parties agree that no evidentiary hearing is necessary. Were I to be constrained by the strong admonition of the Second Circuit against the grant of a preliminary injunction on affidavits where there are disputed issues of fact, *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 872 n. 5 (2d Cir. 1971), the press of my docket would make it rarely possible for me to consider preliminary relief until long after the application had been made.

positive; those which reject it, gram-negative. While penicillin, a comparable antibiotic, is active against only gram-positive bacteria, the cephalosporins are effective against both gram-positive and gram-negative strains. Cephalosporins also have low toxicity and allergenicity, producing relatively few adverse side effects and allergic reactions. One consequence of this is that cephalosporins may sometimes be used to treat penicillin-allergic individuals. (Abraham Affidavit 1–3; Flynn Affidavit 3–4).

In terms of chemical structure, the members of the cephalosporin family have in common a central structural nucleus formed of a 6-membered ring of 7-aminocephalosporanic acid (7–ACA). The various cephalosporins differ from one another in the number and type of side chains attached to the nucleus. While the family members have approximately the same range of antibiotic activity and toxicity, their structural differences result in variant pharmacological properties, that is, differing chemical behavior in the body.

In the early 1960s, British scientists discovered a method to isolate 7–ACA nucleus and add various side chains to create a variety of cephalosporins with activity more potent than Cephalosporin-C. However, the methods used were not practicable for the production of cephalosporins on a commercial scale. About this time the National Research Development Corporation, a crown corporation of Great Britain founded to assist in the commercialization of the inventions of British subjects, became involved in promoting cephalosporin research. It concluded agreements with a number of pharmaceutical companies whereby the companies committed themselves to participate in cephalosporin research and to turn over their findings to the corporation in exchange for access to prior research results and other technical aid. Lilly and at least seven other laboratories in several countries agreed to embark on this research effort. (Flynn Affidavit 4).

Lilly was the first to develop an efficient method of producing 7–ACA nucleus, and by early 1962 Lilly's first cephalosporin antibiotic was ready for clinical trials. (Flynn Affidavit 5–8).

By the end of 1970, Lilly had put three cephalosporin products on the market. Cephalothin, introduced in 1964 under the trademark Keflin, and cephaloridine, introduced in 1968 under the trademark Loridine, are effective only when administered by injection because they are not sufficiently absorbed in the body when given orally.[2] Cephaloglycin, introduced in 1970 under the trademark Kafocin, was Lilly's first oral cephalosporin. Cephaloglycin was found to be 18 to 22% absorbed into the bloodstream upon ingestion, a percentage sufficient to make it a satisfactory oral drug. However, cephaloglycin has reduced activity in comparison with other cephalosporins. This is so because upon ingestion about 90% of the cephaloglycin dose is converted by a chemical reaction into a related compound. This compound has gram-positive activity about equal to that of cephaloglycin, but its gram-negative activity is substantially lower. (Van Heyningen Affidavit 2–3).

In an effort to find an oral cephalosporin which would not undergo the chemical changes exhibited by cephaloglycin, Dr. Robert E. Morin and Dr. Billy G. Jackson, researchers at Lilly, proposed modifying cephaloglycin by substituting a methyl group for the side chain attached to the cephaloglycin molecule at position 3 on the nuclear ring. The resulting compound is known as cephalexin.

Clinical studies of cephalexin demonstrated that, unlike cephaloglycin, the compound underwent no chemical changes upon ingestion, and thus retained its gram-negative activity when given orally. In addition, cephalexin was found to be 100% absorbed from the gastrointestinal tract, and to be completely excreted in the urine without chemical alteration. (Van Heyningen Affidavit 3–4; Griffith Affidavit 4). Thus,

**2.** Some of the facts about Keflin and Loridine are drawn from the findings of fact of Judge Higginbotham in *SmithKline Corp. v. Eli Lilly and Co.,* 427 F.Supp. 1089 (E.D.Pa.1976), *aff'd,* 575 F.2d 1056 (3d Cir. 1978), an antitrust action involving the marketing of cephalosporins.

cephalexin, one of a group of compounds called 3-methyl-cephalosporins, is highly satisfactory for oral administration.

On September 14, 1966, Morin and Jackson applied for a patent on their discovery of the usefulness of various 3-methyl-cephalosporin compounds as oral antibiotics. The '861 Patent was subsequently issued on April 21, 1970. Cephalexin is one of the compounds included within this patent.

Morin and Jackson also developed a process for the generation of cephalosporins from penicillin. Cephalexin can be manufactured by this method. (Van Heyningen Affidavit 4–5). This Morin-Jackson process is the invention claimed in United States Patent No. 3,275,626, entitled "Penicillin Conversion Via Sulfoxide," of which the '861 Patent is a continuation in part.

*The '656 Patent.*

While cephalexin was known to be effective for oral administration, it could not be marketed in the forms in which it was originally produced. It was first crystallized from water at room temperature as a dihydrate, that is, as a crystal containing two molecules of water per molecule of cephalexin. The dihydrate crystals so formed are characteristically small, fluffy and fiber-like, and they are so bulky that a full dose cannot be put into a single capsule of acceptable size. On drying, the dihydrate crystals convert readily into monohydrate crystals by the loss of a single molecule of water per molecule of cephalexin in the crystalline structure. However, the monohydrate so formed is likewise fluffy, and the crystals tend to pick up static charge and become "flyaway," making handling and encapsulation impracticable on a commercial basis.

Lilly research efforts were directed towards the modification of the crystallization process to generate a more manageable product. While crystallization had originally been conducted at low temperatures to reduce the danger of degradation of the cephalexin, Earle Van Heyningen proposed that crystallization be tried at elevated temperatures. It was discovered that at temperatures of about 60° C. or above, cephalexin monohydrate could be crystallized directly, and the crystals so obtained were relatively large, non-hygroscopic, dense and non-electrostatically excitable. Further, a single dose would fit into a capsule of acceptable size. (Van Heyningen Affidavit 6–7).

On April 21, 1969, Van Heyningen filed an application with the Patent Office on this dense form of cephalexin monohydrate (hereinafter sometimes referred to as DCM). The '656 Patent, here at issue, ultimately issued on April 11, 1972.

The patent contains two independent claims as to the crystalline product taught therein. DCM is said to have unique x-ray diffraction properties and its density is said to fall within the range of 0.50 to 0.60 g./ml. The term density is nowhere defined in the patent. Lilly has admitted that all forms of cephalexin monohydrate have the same x-ray diffraction pattern. (Lilly's Answer to Zenith's Interrogatory No. 22).

*Lilly's Commercial Production Of Keflex.*

Before human clinical research can be done on a new drug, an investigational new product application must be submitted to the Food and Drug Administration. Lilly filed such an application for DCM in early 1967 and commenced funding clinical work in 1968. The Food and Drug Administration approved the drug for marketing in early 1971. (Christensen Affidavit 2).

Lilly markets DCM under the trademark of Keflex.

Since 1958 a substantial portion of the time and money allocated to research at Lilly's laboratories has been devoted to work on cephalosporins. Ten million dollars was invested in research and development on Keflex. The research activities funded by this sum included chemical synthesis, laboratory evaluations *in vitro* and *in vivo,* development of analytical methods, development of dosage forms, stability testing, toxicology, development of processes for the production and purification of cephalexin

monohydrate as a chemical product, animal and human pharmacology and metabolism studies and human clinical evaluations. (Herr Affidavit 2). Of that $10 million, Lilly spent over $1.8 million on human clinical studies from 1968 to mid-1977. The purpose of these studies was to attempt to confirm the activity of cephalexin monohydrate observed in laboratory and animal studies in human subjects, to examine and assess the nature and extent of toxicity of the drug upon human administration, to establish appropriate dosage levels, to determine any incompatibilities or contraindications that would suggest precautions to be observed in the use of the drug, and to identify the clinical conditions for which the antibiotic could appropriately and safely be prescribed. A substantial portion of this money was used to fund studies necessary to obtain FDA approval to market the drug. However, more than half was expended after Keflex was put on the market. Post-marketing studies are designed to gain additional information on the drug's activity under normal usage, to answer questions which arise in the course of such usage, and to explore avenues for extending the safeness and usefulness of the drug. Lilly indicates that it continues and will continue to do such work on Keflex in the future. (Christensen Affidavit 2–3).

In order to launch Keflex into the drug market once it was approved by the FDA, Lilly conducted a variety of promotional activities directed at physicians. Information about the drug was conveyed by product samples, medical literature, symposiums and advertising. During the first two years that Keflex was marketed, Lilly spent approximately $12.3 million on such promotion. (Step Affidavit 5).

Since its introduction in 1971, Keflex has experienced substantial commercial success. Yearly sales have increased since 1971 to a high of over $80 million in 1976. It appears that Keflex or cephalexin monohydrate is the most widely prescribed oral cephalosporin in the United States today. (Whale Affidavit 2; Kirby Affidavit 2). Cephalogylcin, Lilly's prior oral cephalosporin drug, is of little general use today because of its relatively poor absorption in the body and its low blood levels, although the drug remains a drug of choice for certain applications, such as urinary tract infections. As against ampicillin, an oral penicillin, cephalexin monohydrate also compares favorably on account of its greater absorption rate and its suitability for penicillin-allergic patients. (Kirby Affidavit 2). Cephalexin monohydrate has obvious advantages over injectable antibiotic cephalosporins where oral administration is not contraindicated in that it may be administered without the stress and expense of injection, and it is suitable for outpatient treatment. (Herr Affidavit 3).

*The Drug Industry And The '656 Patent.*

Lilly has asserted that the pharmaceutical industry in the United States is competitive both in the areas of technological and scientific invention and marketing (Whale Affidavit 2; Step Affidavit 2); that companies within the industry are experienced in the management of patent rights, and that competition promptly appears when the patent on a commercially successful pharmaceutical product expires or appears to be invalid. (Whale Affidavit 2). Zenith does not dispute this characterization of the industry, although it suggests that at least with respect to the '656 Patent there are factors which would militate against challenge of said patent even if it were perceived to be invalid. Zenith's position as to the inferences that may be drawn from the failure of any drug company to challenge the '656 Patent will be addressed *infra*, n. 7. I conclude that Lilly's uncontested characterization of drug industry competition is accurate.

In 1972, the '656 Patent was issued to Lilly as assignee of the inventor, Earle M. Van Heyningen, and at all times since issuance, Lilly has been its owner.

Until Zenith's entry into the market, five and a half years after issuance of the '656 Patent, Lilly was the sole source of cephalexin monohydrate in the United States. The absence of entrants other than Lilly

into the United States market during the period was not a reflection of a dearth of drug industry interest in the manufacture and sale of cephalexin monohydrate. During that period, two small United States pharmaceutical companies sought licenses to make the drug, but Lilly denied their requests. (Whale Affidavit 2–3).

Four multi-national drug companies which manufacture the drug in foreign countries or have the capacity to manufacture it here have respected Lilly's '656 Patent and refrained from entering the United States DCM manufacturing or sales market. Bristol-Myers manufactures DCM in Lativa, Italy, and sells in Italy and other countries where Lilly has no patent. In 1975, Bristol-Myers produced some 15–20 tons of the antibiotic. (Whale Affidavit 3; Whale Affidavit of March 7, 1978 (hereinafter Whale Supplemental Affidavit) 2). Glaxo Group, Ltd. and its affiliate, Ankerfarm, manufacture DCM in England and market it in foreign countries under license from Lilly. In 1975, Glaxo and Ankerfarm manufactured about 35–50 tons of the drug which it sells under the trademark Ceporex. There is no express or implied provision in the Glaxo licenses or other Lilly-Glaxo agreements whereby Glaxo would lose its license right to manufacture, use and sell DCM in foreign countries if Glaxo were to infringe the '656 Patent. (Whale Affidavit 3; Whale Supplemental Affidavit 2–3).

E. R. Squibb and Sons and SmithKline Corporation both manufacture and sell cephradine, a product which is closely related in chemical structure to DCM. Cephradine and DCM are made from identical starting materials and by nearly identical processes. The only difference in their manufacture is that in making cephradine, one of the starting materials must be subjected to a preliminary chemical conversion to a closely related intermediate. To the extent said conversion is incomplete, the unconverted starting material becomes cephalexin in the cephradine product. (Hatfield Affidavit 2). Both SmithKline and Squibb have royalty-bearing licenses under the '656 Patent for the inclusion of up to 10% cephalexin in their cephradine product. Cephradine is manu-

factured by SmithKline in Swedeland, Pennsylvania and by Squibb in Humacao, Puerto Rico. Each company produced about 15 tons of cephradine in 1975. SmithKline and Squibb have the present capacity to manufacture and sell DCM in the United States, and their entrance into the United States DCM market would not be grounds for Lilly to terminate their license rights under the terms of their respective licenses or any other agreements. (Whale Supplemental Affidavit 4–5).

### Zenith's Entry Into The Cephalexin Monohydrate Market.

In late 1977, Zenith began to sell cephalexin monohydrate in the United States in capsule sizes of 250 and 500 mg. Instead of manufacturing the drug itself, Zenith purchases cephalexin in bulk from an Italian manufacturer, imports it and encapsulates it into appropriate capsule sizes in the United States. Zenith obtained the approval of the Food and Drug Administration for its 250 mg. product in April 1976 and for its 500 mg. product in May 1977. (Rooney Affidavit ¶ 9).

Zenith markets its 250 mg. product in a green and white capsule with rounded ends. Each half of the capsule is marked with the notation "Z 463". Zenith's 500 mg. product comes in a green and light green capsule with rounded ends, each half bearing the notation "Z 464". Each capsule size is sold in bottles of 100 capsules. The bottles are labeled as Zenith's Cephalexin Monohydrate and with the amount of the dosage content of each capsule. (Rooney Affidavit ¶¶ 10, 16).

Zenith's choices of capsule colors for each dosage size are identical to the colors of Lilly's capsules for the same dosage size: Lilly markets Keflex in green and white 250 mg. capsules and in green and light green 500 mg. capsules. However, Lilly's capsules of both sizes have pointed ends, and the 250 mg. size bears the notation "Lilly H69" at both ends while the 500 mg. capsule is similarly labeled "Lilly H71". (Rooney Affidavit ¶¶ 9, 10). Zenith selected

its particular color combinations out of a possible 42 colors (and clear), standard capsule colors available in the industry. (Rooney Affidavit ¶ 11). Zenith submits data to the effect that it is standard industry practice for a generic drug to be marketed in capsules with colors the same or similar to those of the chemically equivalent brand name drug (Rooney Affidavit ¶¶ 12–14), and asserts that color equivalency provides a means for quick visual identification of particular drugs and dosage levels which is advantageous for health care administration. (Rooney Affidavit ¶ 17).

Zenith includes in its packaging of its 250 mg. capsules descriptive literature about cephalexin which in its wording is virtually identical to the literature which Lilly encloses in the packaging of Keflex. (Whale Affidavit 4). Further, Zenith has solicited orders for its product by relating it to Lilly's Keflex. Specifically, Zenith's Director of Sales sent a letter to a potential customer in September 1977 representing that "Zenith is now marketing Keflex generically." (Whale Affidavit 3). Lilly's claims of unfair competition are grounded on Zenith's imitation of Lilly's trade dress and the use of Lilly's trademark for solicitation.

Zenith sells one hundred 250 mg. capsules of cephalexin at $15.95 to $22.90 per bottle and one hundred 500 mg. capsules at $31.25 to $44.75 per bottle. (Rooney Affidavit ¶ 6). Lilly's Keflex prices are $23.68 to $25.43 for one hundred 250 mg. capsules and $46.51 to $49.96 for one hundred 500 mg. capsules. (Lilly's Reply Brief 19–20).

On account of Zenith's entry into the cephalexin market, Lilly estimates that it would lose $3.8 to $6.7 million in profits from Keflex sales per year. (Step Affidavit 5). Were Lilly to prevail in this litigation, it appears at this time that Zenith would be hard pressed to respond in damages for Zenith is not in the pink of financial health. In 1976, Zenith operated at a

net loss of $1,775,187 and on December 31, 1976 had a negative net worth. (Work Affidavit 2). Zenith's independent accountants qualified their audit report on Zenith's financial statements for 1976, stating that

[b]ecause of the significant loss reported in 1976 and its effect on working capital and net worth at December 31, 1976, the ability of the Company to continue as a going concern is dependent upon the reestablishment of profitable operations and/or the Company's ability to attain adequate financing.

(Work Affidavit 3). Zenith's Report on Form 10–Q filed with the Securities and Exchange Commission for the quarter ending September 30, 1977 indicates that Zenith's net income for the first nine months of 1977 amounted to $27,973, and that its quarterly profits before taxes had dropped steadily during the year to a low of ($79,-250) (negative $79,250) in the third quarter. (Work Supplemental Affidavit 2). On September 30, 1977, the company had a negative net worth of ($555,280), an increase from a negative net worth of ($476,030) on June 30, 1977. Further, Zenith has pledged substantially all of its accounts receivable, inventory, machinery and equipment, and the capital stock of certain subsidiaries as collateral for bank loans. (Work Affidavit 3; Work Supplemental Affidavit 2). Finally, Zenith is currently involved in a number of litigations defending against claims of patent and trademark infringement and unfair competition. According to the notes written by the company and appended to its 10–Q reports, these actions may result in the assessment of significant damages against the company. Apparently no reserves have been set aside for such an eventuality. (Work Affidavit 4). It appears that Zenith would be incapable of satisfying a judgment in this action in an amount greater than $500,000.[3] (Work Supplemental Affidavit 5).

3. Zenith has submitted the affidavit of Roger W. Coomer, Executive Vice-President of Zenith, who indicates that "in practical terms" Zenith had a positive worth of $794,931 as of June 30, 1977, rather than the negative net worth of ($476,030) reflected in Zenith's 10–Q

form for the second quarter of 1977. He further indicates that Zenith was able to arrange a $5 million five-year line of credit on or before November 21, 1977. Neither of these assertions are convincing. Coomer's net worth figure is partially based on his treatment of con-

## DISCUSSION

■ As a prerequisite to obtaining a preliminary injunction against patent infringement pursuant to 35 U.S.C. § 283 (1954), the movant must show with the appropriate degree of proof that the patent is valid, infringed and owned by the movant, *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 871 (2d Cir. 1971) (hereinafter *Carter-Wallace*); 8 *Walker on Patents* § 686 (Deller 2d ed. 1973), and that irreparable harm will result if relief is not granted. *Mayview Corp. v. Rodstein,* 480 F.2d 714, 716 (9th Cir. 1973). Where these four factors are sufficiently demonstrated, the grant of a preliminary injunction is within the discretion of the court to be exercised in light of general equitable principles regarding injunctions. *Mayview Corp. v. Rodstein, supra,* at 717; *Pacific Cage & Screen Co. v. Continental Cage Corp.,* 259 F.2d 87, 88 (9th Cir. 1958). *See generally,* 8 *Walker on Patents* § 680 (Deller 2d ed. 1973).

■ The standard for an injunction pendente lite of infringement is an unusually high one. While the requisite showing on the merits in other causes of action is probability of success, the party seeking to enjoin infringement ordinarily must bear the burden of demonstrating that the patent is beyond question valid and infringed. *Carter-Wallace, supra,* at 871; *Eli Lilly and Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096, 1099 (5th Cir. 1972). This burden is lightened to some degree where the patent at issue has been the subject of acquiescence or previously has been adjudicated valid.[4] *Eli Lilly and Co. v. Generix Drug Sales, Inc., supra,* at 1099; *Rosenberg v. Groov-Pin Corp.,* 81 F.2d 46 (2d Cir. 1936). Amplifying on the reluctance to enjoin in-

vertible subordinated debentures as equity on the rationale that their maturity date is far in the future. In my view, such analysis amounts to accounting sleight of hand and is inconsistent with the representations in Zenith's 10–Q form which Coomer himself signed. As to the purported line of credit, such credit was to be given in exchange for the sale of $640,000 shares of Zenith stock, and there is nothing in this record which indicates that a credit agreement has actually been executed.

4. The test for a preliminary injunction against patent infringement is substantially lower in Great Britain than it is here in the United States. In *American Cyanamid Co. v. Ethicon Ltd.,* [1975] A.C. 396 (H.L.), a recent seminal opinion on the standard for a preliminary injunction in Great Britain, the House of Lords reversed the Court of Appeal and affirmed the trial court's grant of a preliminary injunction against infringement of American Cyanamid's patent for an absorbable synthetic suture. Writing for the court, Lord Diplock held that the grant of interlocutory injunctions in infringement actions would be governed by the same principles as in other causes of action. He reasoned that while historically a preliminary injunction would not issue against infringement of a patent not already "well established" if a validity challenge were raised, the procedures for the scrutiny of patent applications by patent examiners, the opportunity for opposition at that stage and the availability of meaningful review of examiners' decisions provided an assurance of validity which rendered the historical rule obsolete.

Turning to the showing on the merits requisite for preliminary relief, Lord Diplock noted that the preliminary injunction is a remedy designed to protect the plaintiff against harm caused by violation of his asserted right not adequately compensable in damages. The grant of such an injunction is discretionary, however, requiring a weighing of the plaintiff's need for protection against the defendant's need to be protected from similar injury resulting from being prevented from exercising his asserted legal rights. The Lord concluded that the purpose in giving the court discretion to grant interlocutory relief is stultified by the requirement that discretion may not be exercised except on a showing that the plaintiff is more than 50% likely to succeed on the merits at trial. He emphasized the inappropriateness of a rule which required a mini-trial on the ultimate issues upon affidavit evidence which is not subject to cross-examination and which is incomplete at this early stage in the litigation. It should be noted that he expressed no disapproval of the use of affidavits on an application for preliminary injunction, and indeed assumed that such would be the medium for evidentiary presentation.

Lord Diplock then held that the appropriate legal showing for a preliminary injunction is whether there is a serious question for trial. Unless the material presented to the court discloses that the plaintiff has no real hope of success, the court should proceed to exercise its discretionary function by determining whether the balance of convenience lies in favor of granting or refusing interlocutory relief. *See generally,* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harvard L.J. 3 (1978).

fringement absent acquiescence or prior adjudication, in spite of the presumption of validity[5] accorded to patents, Judge L. Hand has stated:

> The . . . theory is . . . practical. Examiners have neither the time nor the assistance to exhaust the prior art; nothing is more common in a suit for infringement than to find that all the important references are turned up for the first time by the industry of a defendant whose interest animates his search. It is a reasonable caution not to tie the hands of a whole art until there is at least the added assurance which comes from such an incentive.

*Carter-Wallace, supra,* at 871, quoting from *Rosenberg v. Groov-Pin Corp., supra,* at 47.

Public acquiescence in the validity of a patent is manifested by a lack of substantial challenge to the monopoly rights of the patentee under circumstances which would support an inference that the patent had been examined and deemed valid. The rationale for judicial adoption of this standard as a substitute for proof of validity beyond question is

> that those whose interest would lead them to contest validity, have upon examination concluded that contest would be fruitless, and that examination is some assurance of the truth.

*Carter-Wallace, supra,* at 872, quoting from *Rosenberg v. Groov-Pin Corp., supra,* at 48. Essential to acquiescence is a showing that the patented item or process has been exploited commercially and has had great commercial success, for this ensures that the industry has had motive to examine the patent. In addition, there must be a demonstration of respect for the patent by non-infringement for a substantial period of time. No particular numbers of years is definitive, however. The sufficiency of a given time period turns on other factors which strengthen or weaken the inference of validity. Acquiescence has been found in appropriate circumstances over as short a period as five, *McDowell v. Kurtz,* 77 F. 206 (3d Cir. 1896), or six years, *Blount v. Societe Anonyme Du Filtre Chamberland Systeme Pasteur,* 53 F. 98 (6th Cir. 1892), although, of course, the inference of validity that may be drawn from non-infringement alone is stronger where an absence of infringing conduct has continued for a longer period. Thus, I find unconvincing Zenith's position that five and a half years is too short a period over which to show acquiescence. Zenith relies on *Carter-Wallace, supra,* but there the United States government had commenced to infringe on the plaintiff's Miltown patent five years after issuance, and the Second Circuit indicated that "one can hardly assume that the Government deliberately infringes patents it considers valid." *Id.* at 873.

Two cases illustrate factors significant to a finding of acquiescence. In *Norwich Pharmacal Co. v. Veterinary Corp. of America,* 296 F.Supp. 937 (M.D.Ga.1968), the district court granted a preliminary injunction against infringement of the plaintiff's patent for furazolidone, a drug used in the poultry industry to control salmonellosis. The court found that validity had been demonstrated by acquiescence. During the 12 year life of the patent the plaintiff had given no licenses to manufacture, use or sell the drug with the exception of one implied license to sell. The court indicated that the drug industry is generally highly competitive with fierce competition arising from generic houses when any possibility of weakness appears in a commercially significant patent. Further, it found that furazolidone that would infringe the patent was available from foreign sources at low cost. Despite these facts, only a few isolated instances of infringement had occurred, and the patentee had promptly acted to defend its patent. The court gave particular weight to the conduct of the Ralston Purina Company, a poultry industry giant which used large quantities of furazolidone in its operations in both the United States and

5. The presumption of validity, first accorded to patents by judicial construction, was codified in 1952. 35 U.S.C. § 283 (1954).

822

Canada. Because of the difference in scope of the plaintiff's Canadian and U.S. patents, imported furazolidone could be used in Canada without infringing the Canadian patent, while the same import would have infringed the U.S. patent. Despite Ralston Purina's concern with cost savings in an industry characterized by low profit margins, the company imported the inexpensive drug only into Canada and not into the United States. The court indicated that these facts were adequate to show acquiescence. *Id.* at 940.

In *Eli Lilly and Co. v. Generix Drug Sales, Inc.*, 324 F.Supp. 715 (S.D.Fla.1971), aff'd, 460 F.2d 1096 (5th Cir. 1972), a preliminary injunction issued against infringement of Lilly's patent on Darvon, the analgesic. Validity was demonstrated by evidence of acquiescence and of facts tending to disprove the defendant's attacks on the patent based on grounds of obviousness, anticipation and the withholding of relevant prior art from the patent examiner. As to acquiescence, the district court found that the discovery of Darvon resulted from an intensive industry search for a non-addictive analgesic with the painkilling properties of morphine. Darvon was unique in possessing both of these qualities, and thus it met a long felt need. Darvon had exhibited great commercial success. Sales had increased to an annual rate of $65 million with aggregate wholesale sales over the life of the patent amounting to $450 million. Despite the competitive nature of the drug industry, there had been no infringement during the 16 year life of the patent with two exceptions during the 11th and 13th years. The plaintiff had immediately brought suit against the infringers and

obtained consent judgments including admissions of validity. In addition, two industry members had requested licenses under the patent, demonstrating their belief in its enforceability.

To show validity, Lilly relies on the statutory presumption of validity and evidence of acquiescence. The presumption of validity exists merely to give the patent grant substance and value. *Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co.*, 266 U.S. 342, 348, 45 S.Ct. 117, 69 L.Ed. 316 (1924). It has no independent evidentiary value, but rather serves to place the burden of proof on the party who asserts invalidity. *Carter-Wallace, supra,* at 871 n. 4. However, under the standards applied in *Norwich Pharmacal Co. v. Veterinary Corp. of America, supra,* and *Eli Lilly and Co. v. Generix Drug Sales, Inc., supra,* I find that the evidence before me is sufficient to show acquiescence even though the patent at issue is only five and a half years old. Keflex has demonstrated tremendous financial success. The drug industry is highly competitive. Two small companies have manifested recognition of validity by requesting licenses. Relatively inexpensive cephalexin monohydrate is apparently available from foreign sources, yet Zenith is the first and only company to import it into the United States. And most significant, four major drug companies—Glaxo, Bristol-Myers, Squibb and SmithKline—[6] have sophisticated knowledge of cephalosporins and patents, present capacity to make DCM and resources to litigate validity, yet they have respected the '656 Patent and refrained from infringement.[7]

6. SmithKline sued Lilly after the issuance of the '656 Patent for antitrust violations in connection with Lilly's marketing of its cephalosporin drugs. SmithKline alleged that Lilly was driving it out of the cephalosporin market by offering discounts with which SmithKline could not compete. The district court held that Lilly had violated § 2 of the Sherman Act for practices which have no bearing on the validity of the patents at issue in this action, and the district court specifically found that Lilly had the ability to grant discounts on account of its large profit margins on Keflex and Keflin.

*SmithKline Corp. v. Eli Lilly and Co.,* 427 F.Supp. 1089 (E.D.Pa.1976), aff'd, 575 F.2d 1056 (3d Cir. 1978). SmithKline had ample motive and opportunity to challenge Lilly's Keflex patent yet failed to do so.

7. Zenith urges that the fact that Glaxo, Bristol-Myers, Squibb and SmithKline have not infringed the '656 Patent should not be interpreted as a recognition by those companies of the patent's validity because other motives could account for their conduct. Zenith posits three alternative theories: (1) Lilly's market lead time and concurrent development of brand

■ Zenith takes the position that a finding of acquiescence is inappropriate here because acquiescence must be grounded on evidence of affirmative acts which clearly manifest recognition that the patent in question is valid. An example of such conduct would be the cessation of infringement upon notice by the patentee. *W. A. Sheaffer Pen Co. v. Worth Featherweight Pen Co.*, 41 F.2d 820, 821 (S.D.N.Y.1930). Neither *W. A. Sheaffer Pen Co., supra,* nor the other cases upon which Zenith relies, *H. J. Ashe Co. v. Bridgeport Metal Goods Manufacturing Co.*, 273 F.Supp. 196 (S.D.N.Y. 1967) and *Uniroyal Inc. v. Daly-Herring Co.*, 294 F.Supp. 754 (E.D.N.C.1968), support the reading that Zenith gives to them. Naturally such evidence would strengthen the inference that the industry deems the patent valid, but it is not a *sine qua non.*

■ Acquiescence may be refuted by clear argument or evidence of invalidity. 8 *Walker on Patents* § 701 (Deller 2d ed. 1973). To this end, Zenith has inundated the court with technical arguments as to why the '656 Patent is invalid. To summarize its main points, Zenith asserts: (1) that the '861 Patent is prior art to and anticipates the '656 Patent because the '861 Patent claims cephalexin which differs from the product claimed in the '656 Patent only in that the latter compound contains an additional molecule of water; (2) that cephalexin monohydrate is the only stable form of cephalexin and, therefore, the manufacture of cephalexin in accordance with the '861 patent specifications would result in the production of the compound claimed in the '656 Patent; (3) that the only independent claim made in the '656 Patent is that dense cephalexin monohydrate has unique x-ray diffraction properties, Lilly

has conceded that all cephalexin monohydrate has the same x-ray diffraction pattern and, therefore, the '656 Patent must fall; (4) that the density claim upon which Lilly relies for the validity of the '656 Patent is contingent on the x-ray diffraction pattern claim and, therefore, invalid; (5) that the density claim must fall for vagueness because as used in the patent the term "density" does not refer to true density, yet no definition of the term is given; (6) that the density claim is invalid because density measurements by Zenith of materials made from the '656 Patent did not fall within the density parameters specified in the '656 Patent; (7) that the '656 Patent is unenforceable because Lilly breached its statutory duty of candor by failing to disclose to the patent examiner that cephalexin di- and anhydrate automatically revert to cephalexin monohydrate, thereby knowingly giving the false impression that the compound claimed in the '656 Patent was distinct from compounds claimed in the '861 Patent and Lilly's prior U.S. Patent No. 3,275,626.

■ This court is vested with no special expertise in the subtleties of organic chemistry. Without the assistance of expert testimony and a full hearing amounting to a trial on the merits it would be virtually impossible for me to evaluate Zenith's arguments on invalidity so as to determine whether Lilly could meet the very heavy burden of showing its patent is beyond question valid. However, Lilly relies here on the doctrine of acquiescence. Where there is shown conduct sufficient to satisfy the standard for acquiescence it is presumed that members of the industry with technical expertise far greater than that of the average district court judge have examined the patent, considered such

name recognition might have led those companies to conclude that competition with Keflex would not be sufficiently profitable, especially since a major challenge to Lilly's patent would probably induce generic houses to enter the market, further heightening competition and reducing financial reward; (2) the manufacture of cephalexin monohydrate might involve the infringement of one or more other patents which would stand as a deterrent; and (3) since these four companies all have product or

process patents in the cephalosporin field, they might have been reluctant to challenge the '656 Patent for fear of eliciting a counter-attack on their own patents.

Zenith has made these arguments by brief and has submitted no affidavit of facts in support. While Zenith's theories have some conceptual appeal, without substantiation they remain in the realm of theory and cannot carry weight on this motion.

technical arguments as Zenith poses here and decided them in the patentee's favor. It is said the burden of validity is ameliorated where there is acquiescence. *Eli Lilly and Co. v. Generix Drug Sales, Inc., supra,* at 1099. In light of the presumption underlying the acquiescence doctrine, I interpret this statement to mean that the burden on the district court to treat fully and resolve with certainty technical attacks on the patent is also substantially reduced where acquiescence is shown. If the rule is otherwise, the patentee must always be a second class citizen before the courts on an application for a preliminary injunction of infringement. The reason for his lowly status is not necessarily the invalidity of his patent, but the lack of technical training in the court necessary to resolve substantive arguments made by even the most egregious infringer.

There appears to be a divergence in the courts as to whether consideration of technical challenges to validity must be resolved where the standard of acquiescence is met. *Compare Eli Lilly and Co. v. Generix Drug Sales, Inc., supra,* 324 F.Supp. 715, *aff'd as to preliminary injunction,* 460 F.2d 1096 (5th Cir. 1972) and *McDowell v. Kurtz, supra* (infringer's technical challenges on validity considered and discarded) *with Norwich Pharmacal Co. v. Veterinary Corp. of America, supra,* and *Norwich Pharmacal Co. v. International Brokers, Inc.,* 159 U.S. P.Q. 417 (N.D.Ga.1967) (no consideration or perfunctory treatment of infringer's technical challenges). Here I would rely substantially on the presumed analyses of this patent conducted by persons with sophistication in these areas far greater than my own. However, because the practice in this regard is unclear, I shall briefly consider Zenith's arguments.

Zenith has not taken the position that all cephalexin monohydrate has the same bulk density, or that the discovery of a method of crystallization which renders cephalexin monohydrate sufficiently dense that it can be mechanically encapsulated in dosages of acceptable size is unpatentable for obviousness or the like. Instead, its arguments can be condensed into essentially a three-pronged attack on the patent: it asserts that both the x-ray diffraction and density claims are invalid and further asserts that the compound claimed is identical to substances which are the subject of prior patents.

The '656 Patent contains two independent claims. While the x-ray diffraction claim may well be invalid, its demise would not invalidate the entire patent nor vitiate the density claim. 35 U.S.C. § 253 (Supp.1978); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579, 596 (7th Cir. 1971). Section 253 provides that "[w]henever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid." Zenith has failed to raise a serious question that Lilly included its x-ray diffraction claim in its patent application with deceptive intent.

■ Density as used in the second claim is not defined in the '656 Patent. Lilly argues that the term refers not to true density, but to "bulk density," which, with appropriate citation to technical authorities, Lilly asserts is a concept familiar to those in the pharmaceutical industry. To avoid vagueness, a patent must be comprehensible only to persons skilled in the pertinent act. This patent by its terms is to facilitate the pharmaceutical use of cephalexin monohydrate. Zenith has adduced no technical support for its position and thus has failed to raise a substantial question that this density specification would not be understood by persons skilled in the art of handling pharmaceuticals.

As to Zenith's assertion that the density claim is invalid because Zenith's test results on the density of some '656 material did not fall within the range noted in the patent, Lilly indicates without contradiction that Zenith's measurements were of true density, not bulk density. Hence, Zenith has not presented evidence relevant to the validity of that claim, and claim 2 appears valid.

With regard to the third prong of Zenith's argument, the patent indicates that DCM obtained by the crystallization process

practiced therein is denser and more manageable than forms of cephalexin monohydrate obtained by other methods. The novelty claimed is density and not the monohydrate as distinct from the an- or dihydrate. Thus, Zenith's claim that DCM was essentially anticipated in prior patents appears without merit unless Zenith takes the position that all forms of cephalexin monohydrate have the same bulk density or the achievement of denser forms of the compound is unpatentable. As indicated, no such theory has been presented here. Likewise, there appears to be little weight in the argument that there was a failure of candor in not revealing that the an- and dihydrate naturally revert to monohydrate under certain conditions because these facts are irrelevant to the invention, bulk density. Indeed, the patent itself indicates that "the dihydrate readily converts to a monohydrate on drying," but goes on to say that the crystals so formed are fluffy and flyaway. On the basis of this limited analysis, Zenith's main attacks on the validity of the patent are not convincing. As to other technical questions raised by Zenith, I rely on the inference of validity raised by the finding of acquiescence.

As to infringement, Zenith admits to soliciting orders for processing and selling cephalexin monohydrate. (Complaint ¶ 5; Zenith's Answer to Lilly's Counterclaim, Count I ¶ 7). At oral argument, Zenith's counsel indicated that infringement was not admitted because the density of their material was not within the range claimed in the '656 Patent. Since Zenith has interpreted the term density with patent to mean true density rather than bulk density, this position has little merit. Further, Zenith has denied infringement of Lilly's '861 Patent (Complaint ¶ 15), but it has made no similar denial as to the '656 Patent. In addition, Zenith has solicited orders by indicating that it is selling "Keflex generically." (Whale Affidavit 3). These representations constitute an admission of infringement.

With regard to ownership of the patent, Lilly has submitted an affidavit indicating that the '656 Patent was issued to Lilly as assignee from the inventor, and that at all times since issuance, Lilly has been the patent's sole owner. (Whale Affidavit 2). This is sufficient to establish ownership in Lilly, and the question is not contested by Zenith.

Irreparable injury is a requirement for the issuance of a preliminary injunction. Mayview Corp. v. Rodstein, supra, at 716. The availability of a legal remedy in the form of damages has not always precluded the grant of a preliminary injunction. Hilditch v. American Bumper Corp., 15 F.2d 451, 452 (E.D.N.Y.1926). In my view, where the showing on validity is very strong, invasion of the monopoly rights protected by the patent laws should be sufficient irreparable harm without a showing that the infringer is financially irresponsible. Contra, Nuclear-Chicago Corp. v. Nuclear Data, Inc., 465 F.2d 428 (7th Cir. 1972). Here the potential market diversion, the invasion of Lilly's right to exploit its patent up until now exercised solely by Lilly, and the taking advantage of the research and promotional activities performed by Lilly before the expiration of patent protection should be sufficient to carry the burden on irreparable harm. Indeed, in Eli Lilly and Co. v. Generix Drug Sales, Inc., supra, 324 F.Supp. 725, in granting a preliminary injunction the district court relied on such factors, making no finding of financial irresponsibility. The district court subsequently set the case down sua sponte for a hearing, and finding no triable issue of fact, entered a permanent injunction. Id., 460 F.2d 1099. The Fifth Circuit apparently determined that a temporary injunction might be issued without financial irresponsibility, for it affirmed the grant of the preliminary injunction while reversing the grant of a permanent one.

However, by any standard Lilly has amply demonstrated irreparable harm on this record. In addition to the harm aforementioned, it has shown that Zenith's financial status is tenuous at best. Zenith will be able to pay no more than $500,000 in dam-

ages were Lilly to prevail in this litigation. This sum is trivial in comparison to the estimated $3.8 to $6.7 million yearly losses which would be suffered by Lilly on account of Zenith's infringement. Thus, Lilly has no adequate remedy at law.

 Since Lilly has shown validity, infringement, ownership and irreparable harm, the grant of a preliminary injunction is within my discretion in light of the balance of the equities and conveniences and the public interest.

Lilly urges that no equities lie with Zenith, a deliberate infringer. Zenith retorts that Lilly has unclean hands because it obtained the '656 Patent through misrepresentation to the patent office. In addition, Zenith takes up the banner of the consuming public and argues that it serves the general weal by enhancing free competition and providing low cost drugs.

Zenith has indeed infringed deliberately although in the belief that the patent in question is invalid. However, its claims that Lilly has made misrepresentations to the patent office are without merit. While Zenith does provide drugs at low cost, Lilly has served the public to a greater degree by its initial development and testing of Keflex and its continuing program of testing to ensure the drug's efficacy and safety. As to the relative inconveniences, the grant of this motion would halt Zenith's processing of cephalexin monohydrate, but the impact will be considerably less than if Zenith itself manufactured the drug. If the motion is denied, Zenith will continue to cut into Lilly's profits which appear to be protected by a valid patent. In addition, it is likely that other generic houses will enter the market, as is the pattern in the drug industry where a commercially successful patent is challenged. Lilly would be drawn into further litigation to defend its patent, and the loss of profits resulting from the increased competition would result in a reduction of funds available for testing and research and development. Under these circumstances, the balance of the equities is tipped in Lilly's favor. Thus, I will exercise my discretion to grant the instant motion,

enjoining Zenith from infringing on claim 2 of the '656 Patent until the merits of this action are finally resolved.

Before this injunctive order becomes effective, Lilly will be required to post a bond. The terms of the bond may be established by agreement of the parties. If the parties cannot agree, the terms will be determined after hearing. An order in accordance with this decision, with consent as to form, will be prepared and submitted by Lilly within 10 days of the entry of this opinion. Lilly will be required to post its bond on the same date.